Connie KREATE; Vivian Colemire;
and E. Hanlin Bavely, Trustee,
Appellants,

v.

DISABLED AMERICAN VETERANS,
Appellee.

No. 1999–CA–001846–MR.

Court of Appeals of Kentucky.

Nov. 22, 2000.

Steven L. Schiller, Newport, KY, for Appellant.

John O. Sheller, Smith and Smith, Attorneys, Louisville, KY, for Appellee.

Before BUCKINGHAM, KNOPF, and SCHRODER, Judges.

## OPINION

KNOPF, Judge:

Vivian Colemire, Connie Kreate, and Kreate's successor in interest, E. Hanlin Bavely,[1] appeal from a July 7, 1999, order of Campbell Circuit Court acknowledging Colemire and Kreate's abandonment of age-discrimination-based claims against their former employer, the appellee, Disabled American Veterans (DAV). The July 7th order rendered final and appealable an earlier dismissal of similar claims by Colemire and Kreate based on disability-discrimination.[2] The appellants' disability-based claims are the subject of this appeal. The trial court ruled that DAV is exempt from the provisions of Kentucky's Civil Rights Act that forbid disability-based discrimination by employers. The appellants insist that DAV is not exempt. For the following reasons, we agree with the trial court.

Colemire and Kreate allege that they are disabled individuals as that term is used in Kentucky's Civil Rights Act, KRS Chapter 344 (the Act). They further allege that, as of the beginning of 1998, they had been employed "for a considerable period" at the DAV facility in Cold Spring, Campbell County, Kentucky, where they processed contributions mailed to the organization. In 1998, they claim, the manager of the Cold Spring facility reorganized the office and moved them from the jobs they had long performed to jobs their disabilities made difficult if not impossible. When they allegedly objected to this change in the conditions of their employment, they were advised to quit their jobs and to apply for disability benefits. Meanwhile, their former positions were given to newly hired workers who were younger than the appellants and not disabled. Denied accommodation for their disabilities, Colemire and Kreate were compelled to quit their jobs. Soon thereafter they brought this suit.

The appellants' complaint seeks damages and injunctive relief pursuant to KRS 344.040, which makes it an unlawful practice for an employer

> [t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, ... because the person is a qualified individual with a disability.

As noted above, DAV responded to the complaint by denying that it is an "employer" in these circumstances under the Act. KRS 344.030(2), upon which DAV relies, provides in pertinent part as follows:

> for purposes of determining discrimination based on disability, employer means a person engaged in an industry affecting commerce who has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and any agent of that person,.... For the purposes of determining discrimination based on disability, employer shall not include:
>
> . . . .
>
> (b) A bona fide private membership club (other than a labor organization) that is exempt from taxation under Section 501(c) of the Internal Revenue Service Code of 1986.

---

1. Bavely is trustee of Kreate's Chapter 7 bankruptcy estate. Through Bavely the estate asserts an interest in Kreate's cause of action. 11 U.S.C. §§ 701 *et seq.*

2. The prior order was entered April 21, 1999, in response to DAV's CR 12 motion to dismiss. Motions for specific findings and to alter or amend that result were denied by order entered June 3, 1999.

There is no dispute that DAV enjoys a tax exemption under Section 501(c). The trial court agreed, furthermore, that DAV is a "bona fide private membership club," and thus concluded that it is not subject to suits, such as Colemire and Kreate's, for disability discrimination. It is from this determination that Colemire and Kreate appeal.

As a preliminary matter, we note that, although DAV tendered its motion to dismiss pursuant to CR 12, it supplemented its motion with affidavits and other matters outside the pleadings. The motion to dismiss effectively became one for summary judgment, therefore, and we shall fashion our review accordingly. CR 12.02. Summary judgments involve no finding of disputed fact and are reviewed without deference to the conclusions of the trial court. As did the trial court, this Court asks whether material facts are in dispute and whether the party moving for judgment is clearly entitled thereto as a matter of law. Under this state's rules of practice, summary judgments are to be granted cautiously; they are appropriate only when it appears impossible for the non-movant to prove facts establishing a right to relief or release, as the case may be. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991).

Because we are called upon to construe a statute, it may also be well to note at the outset that guiding our construction is the general rule that we are to give effect to the intent of the legislature as expressed in the statutory language and context and revealed by the evil the law was intended to remedy. *Sisters of Charity v. Raikes*, Ky., 984 S.W.2d 464 (1998); *Democratic Party of Kentucky v. Graham*, Ky., 976 S.W.2d 423 (1998); *Wathen v. General Electric Company*, 115 F.3d 400 (6th Cir.1997).

The statutory context is particularly important in this case because the Kentucky Civil Rights Act has not been written on a blank slate, but has been based extensively on federal civil rights law. Indeed, "[e]xecution within the state of the policies embodied [in federal civil rights legislation]" is an express purpose of our Act. KRS 344.020(1). Federal legislation has provided not only much of the substance of our Act, but also much of its form. An exemption like the one at issue in this case for "bona fide private membership clubs" appears in Title VII of the Civil Rights Act of 1964. 42 U.S.C.2000e(b). The same exemption is included in the Americans With Disabilities Act of 1990. 42 U.S.C. § 12111(5). This latter act seems to have been the basis of our statute's exemption, which first became effective in 1992. Because there is apparently no Kentucky appellate decision construing KRS 344.030(2)(b), and because of the General Assembly's intent that our law comport with federal law, we shall turn to the federal-court decisions that have applied the "private membership club" exemptions appearing in the federal statutes.[3]

3. Among the materials DAV submitted in support of its motion to dismiss were nine "right to sue" letters from the EEOC to individuals who had filed complaints with that federal agency alleging disability-based discrimination by the DAV. The letters are from the period December 1986 through October 1998, and in each the EEOC dismissed the complaint on the ground that the DAV was exempt from suit under Title VII because it "is a bona fide membership club." Not surprisingly, DAV submits that these dismissals are conclusive of the issue before us. The appellants, on the other hand, would have us disregard these notices because they did not result from a fully adversarial process and because they do not explain why the agency concluded as it did. The import of these notices, we believe, falls between these two extremes. Courts owe some deference to an agency's interpretation of its controlling legislation, but their fundamental duty, even in the administrative context, is to construe pertinent statutes so as to give effect to legislative intent. *Delta Air Lines, Inc. v. Commonwealth of Kentucky Revenue Cabinet*, Ky., 689 S.W.2d 14 (1985). *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, we are not completely indifferent to the EEOC notices deeming DAV exempt from Title VII, but, as conclusory as these notices are, they provide very little guid-

In *Quijano v. University Federal Credit Union,* 617 F.2d 129 (5th Cir.1980), for example, a former employee alleged that a credit union had injured her as a result of its racially discriminatory hiring practices. The court was asked to decide whether the federally chartered, tax exempt credit union was a "private membership club" under Title VII. The court duly began by trying to fit the ordinary meaning of the phrase to its statutory context:

> The sole issue presented for review is whether the district court erred in granting summary judgment for the University Federal Credit Union holding that the credit union was not an employer within the language of section 701(b)(2) of Title VII. The proposition which guides our analysis of this question is that "Title VII of the Civil Rights Act of 1964 is to be accorded a liberal construction in order to carry out the purposes of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination." *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 425 (8th Cir.1970). *Accord, Rogers v. EEOC,* 454 F.2d 234 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). The statute's definition of "employer" is entitled to similar liberal construction. *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389 (8th Cir.1977).

> . . . .

Webster's Third International Dictionary of the English Language offers the following definition at page 430:

> club—an association of persons for social and recreational purposes or for the promotion of some common object (as literature, science, political activity) usually jointly supported and meeting periodically, membership in social clubs usually being conferred by ballot and carrying the privilege of use of the club property.

The common understanding of the term "club" is reinforced by Webster's definition. The adjectives "bona fide", "private" and "membership", included in the statute serve to indicate the more limited type of club sought to be exempted by the narrow exception in the statute. These modifiers suggest that, in order to be exempt from coverage by Title VII, an association of persons for social or recreational purposes or for the promotion of some common literary, scientific or political objective must also be legitimate (as opposed to sham), private (as opposed to public) and must require some meaningful conditions of limited membership.

*Id.* at 130–131 (footnotes omitted).

In holding that the credit union was not entitled to the private club exemption, the Fifth Circuit emphasized the credit union's narrowly mercantile purpose. The court likened the credit union to automobile clubs that had been found non-exempt under Title VII in other cases. The members of such associations, the court noted, did not commingle or seek from their associations a social outlet and were not selected for membership on that basis. Rather, they had banded together, in the court's words, almost solely for the purpose of achieving a sort of volume discount in the acquisition of certain services. Although this was a legitimate purpose, although the credit union was indeed tax exempt, and although the credit union's membership was plainly limited in the sense of being offered only to the occupants of certain jobs, these factors did not overcome, the court ruled, the absence of social intercourse from the credit union's purposes and practices. Such intercourse, the court suggested, is at the heart of what is ordinarily understood as a private club and is one of the few interests fundamental enough to justify an exception from Congress's otherwise clear intention to eradicate invidious discrimination.[4]

ance to the construction of KRS 344.030(2) and so are of limited authority.

4. A similar focus on sociality has informed the cases construing the slightly different pri-

Similarly, in *Fesel v. Masonic Home of Delaware, Inc.*, 428 F.Supp. 573 (D.Del. 1977), the Court ruled that a nursing home affiliated with a masonic lodge was not a club and so was not exempt from Title VII. Although its "membership" (*i.e.* its residents) was strictly limited to Masons and their spouses, the home principally provided housing and health-care services, not the sort of sociability ordinarily associated with a private club. *See also Mills v. Fox*, 421 F.Supp. 519 (E.D.N.Y.1976) (nursing home not entitled to exemption because is did not resemble what is ordinarily understood as a private club). And in *Willson v. Association of Graduates of the United States Military Academy, West Point*, 946 F.Supp. 294 (S.D.N.Y.1996), the court rejected a summary judgment motion by an alumni association facing discrimination charges because the association's claim that it was entitled to the private club exemption had been countered by plausible allegations that the association was a mere fund-raising organ and not a bona fide club whose primary purposes included social intercourse.

Sociability was also a crucial factor in *Equal Employment Opportunity Commission v. The Chicago Club*, 86 F.3d 1423 (7th Cir.1996). In that case, the EEOC sought to compel one of Chicago's historic clubs to comply with Title VII's record-keeping and reporting requirements. Against the club's assertion of the exemption, the EEOC noted that the association's membership is fairly large, (in excess of 1200), and through a liberal guest policy, club facilities are available to a substantial portion of the public. These facts, the EEOC asserted, belied the club's claim to be private.

The court strongly disagreed. It regarded the appellee's practices and purposes—its providing for its members, as one of its principal functions, dining facilities and meeting spaces; its limiting new memberships to existing members' acquaintances who are nominated and elected by existing members; and its extending guest privileges only to those properly sponsored by a member—as plainly geared toward private social intercourse. Indeed, the court chided the EEOC for seeking "to change the rules of the game so as to facilitate [its] implementation of its ambitious agenda for oversight of private clubs under Title VII." 86 F.3d at 1433.

In upholding the Chicago Club's claimed exemption from Title VII, the Seventh Circuit recognized the factors potentially indicative of that status quoted above from *Quijano* and cited these factors from an EEOC policy statement:

(1) the extent to which it limits its facilities and services to club members and their guests;

(2) the extent to which and/or the manner in which it is controlled or owned by its membership; and

(3) whether, and, if so, to what extent and in what manner it publicly advertises to solicit members or to promote the use of its facilities or services by the general public.

vate club exemption in Title II of the Civil Rights Act. 42 U.S.C. § 2000a(e). Title II forbids invidious discrimination in places of public accommodation, resort, or amusement. *Cf.* KRS 344.120. Rotary clubs, Jaycees, Kiwanis clubs, Little League, Boys Clubs, and the Boy Scouts, among others, have all sought exemption from Title II or state-law counterparts on the ground that they are distinctly private membership associations and not public accommodations. In making this distinction courts have looked closely at, among other things, the extent to which the association's purposes and practices are sociable as opposed to commercial or business related.

*See Board of Directors of Rotary International v. Rotary Club*, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) (membership association's other purposes sufficiently over shadowed by its business purposes to make it subject, within the United States Constitution, to state public accommodations statute); *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (same); *Welsh v. Boy Scouts of America*, 993 F.2d 1267 (7th Cir.1993) (membership association's purposes primarily sociable and so not subject to state public accommodations statute); *Kiwanis International v. Ridgewood*, 806 F.2d 468 (3rd Cir.1986) (same).

*Id.* By all these standards, the court believed, the Chicago Club is private. The EEOC conceded the second and third factors: the club was completely owned and controlled by its members, and it did not solicit either members or guests by public advertisement. As for the first factor, size alone, the court stated, does not determine an association's status. Rather, the court opined,

> selective membership practices are the essence of private clubs. Decisions concerning a club's membership expansion are to individual members significant as their own decisions to join the club. One presumably affiliates with a private club because of the community of interests or agendas shared by the membership. The integrity of those common interests or agendas has much at stake in the membership selection process, and membership participation in the selection of new members is a crucial attribute of a private club. By participating in the selection process, members guarantee that the interests they share with other members will continue to bind the membership in the future.

86 F.3d at 1436. The Seventh Circuit concluded that the Chicago Club satisfied this selective membership requirement. "The undisputed facts suggest that the members of the Club exercise complete autonomy in the selection process." *Id.* This discussion by the Court in *Chicago Club*, concerning "selective membership" seems to us again to be based on the fundamental interest people have in intimate social contact. A "private club" is one that limits its membership to further such social intercourse.

We have referred at some length to these precedents to underscore both the importance of the issue raised by this appeal and its difficulty. As these cases show, fundamental interests are implicated on both sides. How best to characterize and coordinate them is by no means clear. As we have indicated in our discussion of these cases, it seems to us that exemption from federal civil rights laws has been recognized only when the membership association has had as one of its primary purposes genuine social intercourse among its members. That purpose, furthermore, must be meaningfully reflected in the method by which members are chosen and guests admitted to the club's facilities. This requirement comports with the ordinary meaning of the statutory term "club" as well as with that term's anti-discrimination context, which clearly indicates that the exemption is to be a narrow one.[5] This is not to say that an exempt private association may not have purposes other than sociality. Distinctly private clubs form around a vast array of interests and enthusiasms from the most narrowly personal to the political. It is to say, however, that sociality must remain a principal purpose of the association relative to any others, particularly mercantile ones.

The appellants insist that DAV's purposes are not appropriately private and geared toward sociality to exempt it from compliance with KRS 344.040. They note that DAV is a federally chartered corporation, whose purposes and membership are dictated by its founding legislation. 36 U.S.C. §§ 50301 *et seq.* (formerly 36 U.S.C. §§ 90 *et seq.*). DAV is dedicated, among other purposes, "to advance the interests, and work for the betterment, of all wounded, injured, and disabled American veterans." 36 U.S.C. § 50302(3). To further that aim, DAV has established national and regional offices that provide services to all veterans and all disabled veterans, whether members of DAV or not. Its

---

5. Although the distinction does not affect our present analysis, we note that Kentucky's exemption is even narrower than the federal one. It is limited to "discrimination with respect to disability." Whether it is a private membership club or not, therefore, DAV (assuming that it qualifies otherwise as an "employer" under our statute) may not discriminate in its employment practices on the basis of race, color, religion, national origin, sex, or age forty (40) and over.

total membership exceeds 1,000,000, and admission to DAV, while restricted to individuals disabled in the line of duty during time of war in the service of the United States armed forces or its allies,[6] is not subject to the sort of member control discussed in *Chicago Club, supra,* which was based on existing members' subjective estimates of the prospective member's compatibility. Its membership, rather, may perhaps be characterized as open to anyone in the general public who has come to occupy a particular role, like the credit union membership discussed in *Quijano v. University Federal Credit Union, supra.*

Of particular significance, appellants assert, in demonstrating DAV's essentially public nature is the fact that its federal income-tax exemption derives not from the section of the tax code that refers specifically to "clubs,"[7] but rather from the section exempting "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare[.]" 26 U.S.C. § 501(c)(4). Moreover, appellants note, donations to DAV are tax deductible by the donor, a deduction that would not exist if DAV did not put those donations to public uses. In short, appellants contend, DAV is to a large extent devoted to fund raising and to the provision of public service, and so, like the nursing home in *Fesel v. Masonic Home of Delaware, Inc., supra,* it should not be deemed exempt from the civil rights laws.

We agree with appellants that DAV's interest-group and public-service purposes tend to weigh against its claimed exemption as a private club. On the other hand, however, DAV does serve its members' interest in sociability. True, its membership is large and is selected on an objective basis. The military experience admitting one to membership to the DAV, however, unlike the employment relationship in *Quijano,* is profoundly meaningful for almost all who go through it. It defines, it seems

to us, not simply an interest group, but a group for whom a very special social intimacy is possible. Encouragement of such intimacy, furthermore, is among DAV's express purposes:

> The purposes of the corporation are
>
> . . .
>
> (5) to stimulate a feeling of mutual devotion, helpfulness, and comradeship among all wounded, injured, and disabled veterans.

This purpose is given practical expression in the local chapters of the DAV, which serve as clubs for their members in much the same way the Chicago Club does for its members.

■ Is the DAV, then, the institutional means for individuals with common economic interests to band together, like the credit union in *Quijano?* Is it a public-service provider, like the nursing homes in *Fesel* and *Mills?* Or is it a private club serving its members' interest in comradeship, and sociality, like the membership association in *Chicago Club?* The problem is that the DAV is all of these and is each of them to a significant degree. As discussed above, however, a private association's public activities need not disqualify it from exemption provided that the association's structure remains meaningfully private and that private sociability remains, in practice as well as theory, one of the association's core purposes. We are persuaded that DAV satisfies this test. Notwithstanding DAV's significant public purposes and activities, its core purpose, embodied in its many local chapters, is to provide social opportunities for its members. Its membership, moreover, is genuinely limited in a manner calculated to further that private purpose. The trial court did not err, therefore, by concluding that DAV, as a bona fide private membership club, is exempt from KRS 344.040's provision against disability discrimination.

6. 36 U.S.C. § 50303(a)(1)(A), (2)(A).

7. 26 U.S.C. § 501(c)(7).

Given this conclusion, a second issue raised by Kreate needs only brief comment. Between the time she left her employment with DAV and when she filed this suit, Kreate petitioned for relief under Chapter 7 of the Bankruptcy Code. 11 U.S.C. §§ 701 *et seq.* On her petition she listed as an asset her potential cause of action against her former employer. Soon after this suit was commenced, DAV moved to have Kreate dismissed as a party on the ground that the bankruptcy estate had become the only entity with standing to assert Kreate's claim. The trial court agreed with this contention and as part of its April 21, 1999, order granted DAV's motion. Kreate has appealed from that ruling.

She maintains that some of the relief to which she would be entitled were her cause of action to succeed (future damages, for example) would not be property of her bankruptcy estate. Her interest in the cause of action has thus not been completely subsumed by the bankruptcy, she argues, and consequently the trial court erred by ruling that she lacks standing.

 Because the dismissal of Kreate's cause of action has rendered moot this question of her standing, this latter issue is not subject to our review. *Sharp v. Robinson*, Ky., 388 S.W.2d 121 (1965); *Civil Service Commission v. Tankersley*, Ky., 330 S.W.2d 392 (1959). Therefore, we must decline to address it.

In sum, although it is certainly ironic that an association of disabled persons should find itself seeking refuge from a law forbidding disability-based discrimination, we are persuaded that DAV has a right to the refuge it seeks. The disability-based discrimination claims brought by Colemire and Kreate do not apply, according to KRS 344.030(2), to bona fide private membership clubs. Although DAV is federally chartered, has become a large organization with various tax advantages, and has succeeded in providing important public services to veterans beyond its own membership, DAV, especially through its local chapters, is fundamentally concerned with restoring and enriching the private social lives of its members. Because DAV's principal purpose is strongly geared toward serving its members in this way as a private club, we agree with the trial court that, despite its public activities, it is exempt from Colemire and Kreate's suit.

For these reasons, we affirm the July 7, 1999, order of the Campbell Circuit Court.

ALL CONCUR.