**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3591
_____

ANTHONY DESANTIS,
                                                    Appellant

v.

NEW JERSEY TRANSIT; ALAN WOHL;
FRED D'ASCOLI; JOHN DOES 1-10; JANE DOES 1-10;
ABC CORPORATIONS A THROUGH Z
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action No. 2-14-cv-03578)
District Judge:  Honorable Kevin McNulty
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 15, 2018
_____

Before: GREENAWAY, JR., BIBAS, and FUENTES, *Circuit Judges*.

(Opinion Filed: January 25, 2019)

_____

OPINION[*]

_____

GREENAWAY, JR., *Circuit Judge*.

This is a civil rights action brought by Anthony DeSantis against New Jersey

Transit ("NJT") and two of its employees, Alan Wohl and Fred D'Ascoli (collectively,

"Appellees"), for failing to hire DeSantis for a management position. The District Court

granted summary judgment in favor of Appellees. For the reasons set forth below, we

will affirm the judgment of the District Court.

## I. Factual Background

Appellant Anthony DeSantis is an accountant who was employed at NJT. He

began as a Senior Accountant in the Fixed Assets department, and was eventually

promoted to Principal Accountant. The crux of his case is that he was passed over for the

position of Fixed Assets Manager [hereinafter, "Manager"] on two occasions, once

before and once after his being promoted to Principal Accountant. More important, he

was frequently asked and expected to perform the duties of the Manager position, as well

as his own, while the individual that formally held the position he coveted received the

credit.

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

The position was first available in 1993, roughly eleven years after Appellant was hired. But according to Appellant, his supervisor and the Director of Fixed Assets, Alan Wohl [hereinafter "Director Wohl"], did not permit Appellant to apply.[1] Instead, Rupert Biswas, who Appellant refers to as an NJT outsider that was "ill equipped" for the job, was awarded the position. *See* Appellant Br. 3 (citing Appendix ("App.") 3, ¶¶ 17, 18).[2] In turn, Appellant was required to train Biswas, and claims that he performed Biswas's work for the following two decades, while Biswas received all the credit. The position of Principal Accountant became available during that time, and Appellant applied for and received the promotion.

The issues raised on appeal center on the second, and most recent, instance in which Appellant was passed over for the Manager position. The position became available again in 2013, when Biswas announced his retirement. Four candidates were considered and interviewed: Appellant, Fariba Cattan, Chris Trinca, and Jeffrey Omoyi. The Interview Panel consisted of Director Wohl, Director of Corporate Recruiting Jeffrey Klugman, and Manager of Third Party Billing John Weber. Each panel member individually evaluated and graded each candidate. The Panel ranked Cattan well above the rest of the field in both qualifications and answers to interview questions, and Appellant third out of the four candidates.

---

[1] Appellant admits that a fellow employee was also not permitted to apply, but does not explain the basis or what he believes to be the basis for Director Wohl's actions.

[2] Biswas had been working at a chemical company prior to coming to NJT.

Critically, the job announcement stated that a candidate that possessed a Certified Public Accountant ("CPA") license or Master of Business Administration ("MBA") degree was preferred. Appellant possessed neither. Although Cattan had not previously worked in the Fixed Assets department, she had served as Principal Accountant in the Cost Accounting & Analysis Department since 2007, had earned a master's degree in accounting, and a MBA. The Panel subsequently recommended Cattan for the job, and Fred D'Ascoli, then NJT Deputy Chief Financial Officer and Controller, [hereinafter "Deputy CFO D'Ascoli"] approved her hire based on its recommendation. Cattan began her new role on February 28, 2013.

The ensuing months were contentious at best, and culminated in Appellant's medical leave on July 17, 2013. Appellant explains that after Cattan's hire, but prior to Biswas's departure, Biswas, Director Wohl and other management personnel expected Appellant to train Cattan for the Manager position, while at the same time performing his own duties as Principal Accountant. He also reports that his supervisor, Director Wohl, told him that "shit rolls down the hill and you are going to always be at the bottom." App. 183. In Appellant's view, what occurred was precisely what was foretold: in addition to his own work, he had to train Cattan who often had difficulty understanding the work that she was tasked to perform. This led Appellant to question why she was viewed as more qualified.

Cattan took exception. After calling a meeting that included Appellant, Director Wohl, and herself, she wrote an email reprimanding Appellant. In the email, dated May

4

31, 2013, she asserted that Appellant had demonstrated a lack of respect and cooperation toward her from the time she had been awarded the position, and warned that as Appellant's Manager, she expected such behavior to cease. According to the minutes of the meeting, Appellant revealed that his bitterness toward Cattan was due to his having been overlooked for promotion, and his feeling embarrassed and upset that he did not get the job. Appellant took medical leave not long thereafter, attributing his being ill to the mounting job-related stress.

## II. Relevant Procedural History

A few months prior, on April 8, 2013, Appellant sent a letter to the Equal Opportunity Employment Commission (EEOC), alleging discrimination on the basis of his age and disability. As to age, Appellant was 60 years old when he was considered, which means he was six years older than the candidate who was selected, with the other two candidates being 48 and 50. As to his disability discrimination claim, Appellant has several physical disabilities that he believes led to his being passed over for the Manager position: he is an epileptic, paralyzed in the left arm, and walks with a limp. Director Wohl appears to have been aware of the paralysis in Appellant's left arm and his limp. Appellant filed formal charges on these bases shortly before taking his leave on July 13, 2013, and the EEOC issued a right-to-sue letter on March 6, 2014.

Appellant brought this action on June 3, 2014, alleging discrimination on the part of NJT in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112; Title VII of

the Civil Rights Act, 42 U.S.C. § 2000e-2(a); and the New Jersey Law Against

Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5–12.  He also alleged aiding and

abetting on the part of Director Wohl, and Deputy CFO D'Ascoli, in violation of NJLAD.

The six counts alleged in the complaint and amended complaint consist of:

> Count I:  Age discrimination in violation of the ADEA and NJLAD
> Count II:  Disability discrimination in violation of the ADA and NJLAD
> Count III:  Harassment and a hostile work environment under NJLAD[3]
> Count IV:  Associational race discrimination under Title VII and NJLAD
> Count V:  Race discrimination in violation of Title VII and NJLAD
> Count VI:  Aiding and abetting in violation of NJLAD

App. 170.  Appellant's race discrimination claim is premised on his being married to an

African-American woman;[4] and the hostile work environment and aiding and abetting

claims stem from Cattan's letter of reprimand.

The District Court granted Appellees' motion for summary judgment on all

counts.  For the reasons set forth below, we will affirm.

---

[3] Hereinafter simply referred to as a hostile work environment claim.

[4] Appellant's race discrimination claims did not appear in his EEOC charge of discrimination.  On that basis, Appellees moved to dismiss for failure to exhaust, as 42 U.S.C. § 2000e–5(e)(1) would require.  The District Court denied that motion because the operative complaint only mentioned the EEOC right to sue letter, which broadly stated that the EEOC investigation failed to establish a violation of the relevant statutes.  *See DeSantis v. New Jersey Transit*, 103 F. Supp. 3d 583, 593 (D.N.J. 2015).  The District Court thus considered this claim on the merits at summary judgment.  *See* App. 180, n.9; *see also Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) ("Once a charge of some sort is filed with the EEOC, . . . the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'"); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976).

6

### III. Jurisdiction & Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1367(a); we have jurisdiction to review the District Court's grant of summary judgment under 28 U.S.C. § 1291. *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95 n.7 (3d Cir. 2009). Our review is plenary, and we apply the same standard as the District Court. *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). Under that standard, summary judgment is appropriate only if, construed in the light most favorable to the non-moving party, the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. *See Wharton v. Danberg*, 854 F.3d 234, 241 (3d Cir. 2017) (citing Fed. R. Civ. P. 56(a)). A fact is only material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

### IV. Analysis

In his opening brief, Appellant argues that the District Court erred in granting summary judgment as to all but Count V.[5] The first four sections of his brief relate to the

---

[5] Appellant's claim in Count V focused on NJT's alleged failure to promote his wife and other African-Americans, whereas Count IV alleged that Appellant suffered discrimination on account of his being married to an African-American woman. Neither survived summary judgment. *See* A.R. 181–83 (finding that Count V fails because Appellant "neither presents evidence of discrimination against his wife nor argues that he is in the 'zone of interests' protected by Title VII."). But Appellant fails to make an argument as to Count V in his opening brief. Rather, in the two sections of Appellant's opening brief that discuss racial discrimination, Appellant only persists on his claim of associational race discrimination based on his marriage. The first section, labeled "Point III," discusses how that claim amounts to a Title VII violation, and the second, labeled

7

District Court's decision as to the age, disability, and race by association claims, and the latter two to the hostile work environment, and aiding and abetting claims. Because the underlying claims are governed by the same legal framework, we (A) address the arguments made in the first four sections of Appellant's brief in tandem, then (B) briefly discuss his hostile work environment claim.

We conclude that Appellant has failed to show that the decision not to award him the Manager position was motivated by discrimination on any of the alleged grounds. Instead, the decision was a reflection of the hiring committee's assessment that another candidate was more qualified. As a result, he cannot make the causal showing that is required for his discrimination claims as well as hostile work environment claim. We will therefore affirm the District Court's decision on those claims, and also on Appellant's aiding and abetting claims.[6]

## A. Age, Disability, Race By Association, and Race Claims

Because Appellant has not provided direct evidence of discrimination, the District Court properly applied the burden shifting framework of *McDonnell Douglas Corp. v.*

---

"Point IV," discusses how it amounts to an NJLAD violation. *See* Appellant Br. 20–23. Thus, Appellant has waived any issue as to Count V. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.") (citations omitted).

[6] *Inter alia*, an aiding and abetting claim under NJLAD requires a finding that the party whom the defendant aids performed a wrongful act that caused an injury. *See Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004). Since we find that NJT is not liable for any of the wrongful acts alleged, Appellant's aiding and abetting claims against Director Wohl and Deputy CFO D'Ascoli under NJLAD also fail.

8

*Green*, 411 U.S. 792 (1973) to his age, disability, and associational race discrimination claims under Title VII, the ADA, the ADEA, and NJLAD.  *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (O'Connor J., concurring) (referencing the application of *McDonnell Douglas* in Title VII cases involving indirect evidence); *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) (applying *McDonnell Douglas* in ADA cases involving indirect evidence); *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (affirming that we apply *McDonnell Douglas* in ADEA cases involving indirect evidence); *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999) (applying *McDonnell Douglas* to NJLAD cases involving indirect evidence).

Under this framework, the plaintiff has the burden of establishing a prima facie case of discrimination, with the particular requirements differing based on the form of discrimination alleged.  *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426–27 (3d Cir. 2013). If the plaintiff succeeds, the burden shifts to the defendant to provide evidence of a legitimate, non-discriminatory reason for the adverse employment decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  Once the defendant meets that burden, the plaintiff must demonstrate that the defendant's proffered reason was a pretext for discrimination.  *Id.* at 804; *see also Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Burton*, 707 F.3d at 412)).

The District Court found that Appellant failed to meet his burden of establishing a

9

prima facie case as to all counts.[7] We agree.

Central to that assessment is that although some prima facie elements differ based on the alleged form of discrimination, most share one element that Appellant fails to meet—that is, in one form or another, all but Appellant's ADEA claim require him to demonstrate that the adverse employment action that he suffered was due to discrimination in the form he alleges. Indeed, to make out a prima facie case of race discrimination, Appellant must show that the adverse employment action he suffered occurred under circumstances that give rise to an inference of unlawful discrimination. *See Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). And for a case for discrimination on the basis of a disability, Appellant is required to show that he suffered the otherwise adverse employment action as a result of discrimination. *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004).

To that effect, Appellant's entire case centers on his view that "[i]t was not possible that [Cattan] was more qualified for the position [of Manager] than [Appellant]," Appellant Br. 14, and his insistence that, as a result, we must infer that NJT's decision to hire Cattan was motivated by discrimination on the bases he outlines. He supports that view with evidence that some of the individuals that played a role in the decision not to

---

[7] In the alternative, the District Court found that Appellant could not demonstrate that NJT's proffered reason—that Cattan was the more qualified candidate—was a pretext for discrimination. *See* App. 177–79, 181.

hire him for the position were aware that he possessed the characteristics necessary for him to qualify as a member of the relevant protected group—i.e., the interviewers and Deputy CFO D'Ascoli were all aware of his age; since his wife was an NJT employee in a similar capacity, it can be inferred that it was known that he was married to an African-American woman; and it is undisputed that Director Wohl knew of Appellant's disabilities.

But Appellant cannot meet his burden on that evidence alone.

While it might be possible that an inference of discrimination can be drawn where a claimant shows that they are overwhelmingly more qualified than other candidates and it is known that they are a member of a protected class, that is simply not the case here. As the District Court found, the record contains ample, legitimate bases for NJT to conclude that Cattan was more qualified than Appellant. Cattan possessed the preferred MBA degree, previously held the same position as Appellant, albeit in a different department, and was ranked well above the rest of the field by four separate interviewers who graded each candidate in multiple categories.

According to Appellant's own view, Cattan was certainly more qualified than the previous Manager, Rupert Biswas, who not only lacked Fixed Assets experience, but also had no experience with NJT as a whole. On that score, it is neither implausible nor illogical, as Appellant contends, that NJT would consider Cattan more qualified than he, who was ranked third out of the four potential candidates by the same interviewers. Appellant's view might be correct if NJT had narrowed its definition of qualified to only

those who had worked in the Fixed Assets department for an extended period of time. But that was not NJT's approach when it hired the previous Manager, it was not its approach here, and it is not what the law requires.

To suggest potential favoritism, Appellant references the fact that Cattan's husband worked for NJT and, according to Appellant, may have been close friends with Director Wohl. But Appellant's wife also worked for NJT, and the Interview Panel that ranked Cattan well above Appellant consisted of two other individuals, with the final decisionmaker being Deputy CFO D'Ascoli. There is no evidence suggesting favoritism on the part of those individuals.[8] Along those lines, Appellant cannot hope to make out a case on his bald allegation that Cattan was provided the interview answers, supported only by his belief that it was implausible for Cattan to provide answers that were better than his since, in his view, she lacked the technical know-how.

Indeed, as Deputy CFO D'Ascoli explained, although "[Appellant] may have had more technical expertise in [the] particular area that he was responsible for, . . . the job of the manager was much broader than that specific technical information." App. 36. The Manager "would be relying on their staff to perform most of the technical tasks, and they would be responsible for reviewing the work and compiling it and presenting it." *Id.* Thus, from NJT's perspective,

> "when you're selecting the manager[,] you want somebody who has the capacity, that has some kind of a demonstrated ability and some kind of credentials that would

---

[8] Appellant also fails to offer support for the notion that favoritism in and of itself is actionable under any of the relevant statutes.

qualify them, or most qualify them, for that position, not just at that exact point in time but, you know, to be able to advance and contribute and grow into it."

*Id.*

As to his age discrimination claim, Appellant argues that the District Court improperly required him to show that the person given the promotion over him was under 40 years of age. Not so. The District Court expressly premised its ruling on the fact that "Cattan is not so 'significantly younger' as to support an inference of discriminatory animus," Appellant had not identified a single instance when anyone spoke to him inappropriately about his age, and the other two candidates were younger than either Cattan or Appellant. *See* App. 176–77. That analysis is consistent with our precedent. *See Smith*, 589 F.3d at 689 (stating that the plaintiff is required to show that he or she was "ultimately replaced by another employee who was *sufficiently younger* to support an inference of discriminatory animus.") (emphasis added); *see also Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 304 (3d Cir. 2004) (acknowledging the above as the requirement in the ordinary employment termination case under the ADEA, and then proceeding to hold that "we are satisfied that we should apply the same standard for the fourth element of [a] prima facie case under the NJLAD").

With all that in view, we conclude that Appellant has failed to meet his burden of establishing a prima facie case on any of the alleged grounds.

## B. Harassment and Hostile Work Environment Claim

Appellant's failure to establish a prima facie case of discrimination bears heavily on his hostile work environment claim under NJLAD, for that claim also requires a

13

showing that, *inter alia*, NJT's conduct would not have occurred but for Appellant's membership in a protected category—i.e., Appellant's age, disability, or wife's race. *See Taylor v. Metzger*, 706 A.2d 685, 688–89 (N.J. 1998) (citing *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 453–54 (N.J. 1993) as formulating the basic standard).

Appellant's claim is premised on the combination of the extended hours he had to work solely because he had to perform the work of others, his being passed over for the Manager position, being told, at one point, that "shit rolls down the hill and you are going to always be at the bottom," and the reprimand he received from Cattan. App. 183. The record is devoid of evidence that any of these related to his age, disability, or his wife's race. So even if he could demonstrate that his experience rose to the level of a hostile work environment—the District Court found he could not, and nothing convinces us otherwise—his claim would not survive summary judgment.

## V. Conclusion

For all those reasons, we will affirm the judgment of the District Court.